UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| RICHARD GLEN EDMONDS, JR. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:07 cv 266 PS |
| ) | |
| FERALLOY MIDWEST CORPORATION ) | |
| and INTERNATIONAL LONGSHOREMAN'S ) | |
| UNION LOCAL 2038, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

On July 17, 2007, Plaintiff Richard Glen Edmonds, Jr. filed a Complaint against his former employer and the union to which he belonged, Defendants Feralloy Midwest Corporation and International Longshoreman's Union Local 2038 [DE1]. The Complaint alleges Feralloy discriminated against Edmonds on the basis of his race, breached the Collective Bargaining Agreement it had with the Union (which covered Edmonds), and violated other employment laws. (*See* DE 1 ¶¶ 6-39.) The Complaint also alleges the Union breached its duty to represent Edmonds fairly with respect to claims he had against Feralloy. (*See id.* ¶¶ 40-41.)

Both defendants moved for summary judgment, and Edmonds declined to respond. The defendants then moved for a summary ruling on their motions pursuant to Local Rule 7.1(a). While I will not give a summary ruling under Rule 7.1(a) in this case, because there are no genuine issues of material fact, summary judgment is appropriate.

**BACKGROUND**

Edmonds is a black male who was employed by Feralloy from June 1998 until March 20, 2006, to operate heavy equipment in shipping and receiving at Feralloy. (DE 1 ¶ 6.)[1] Defendant Feralloy Midwest Corporation is a steel processing company with a plant located in Portage, Indiana. (DE 29-1 ¶1.) Edmonds was a member of the Union and subject to the Collective Bargaining Agreement between it and Feralloy. (*Id.* ¶3; *see also* DE 31-1 § II, ¶3.)

The CBA provided for an attendance policy for Feralloy's employees. (DE 31-1 § III; ¶1.) The policy allowed for discipline based on control points, which were assessed for employee tardiness or absences. (*Id.*) It assessed half of a control point for each incident of tardiness. (DE 29-1 ¶7.) Employees with six or more control points in a twelve-month period were subject to discipline. (*Id.*) As outlined in the CBA, the discipline proceeds as follows: (1) a written warning is issued when an employee receives six or more control points in a twelve-month period; (2) a five-day suspension is imposed when an employee receives six and one-half or more control points in a twelve-month period; and (3) an employee can be dismissed when the employee accrues more than seven and one-half points in a twelve-month period. (*Id.*)

---

[1] I refer to certain allegations in the complaint because they do not appear to be contested by the defendants. However, both defendants filed statements of material facts pursuant to Local Rule 56.1, and Gregg has chosen not to respond to those statements or file a statement of his own. The time for Gregg to do so has long since passed. *See* Local Rule 56.1(a). *See also* Local Rule 7.1(a). Consequently, I will assume all facts contained in the defendants' statements that are supported with admissible evidence "are admitted to exist without controversy." Local Rule 56.1(b). *See also Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (noting that district courts are entitled "to require strict compliance with its local rules governing summary judgment" and "that a district court is entitled to decide the motion based on the factual record outlined in the Local Rule 56.1 statements.") (quotation marks and brackets omitted). There is significant overlap between the defendants' statements of fact, but because they do not contradict each other I'll generally only cite one for the sake of simplicity.

The CBA also provides a grievance procedure through which employees can challenge any action taken by Feralloy they believe is contrary to the CBA. (*Id.* ¶8.) It has two steps. First, the employee is to refer his grievance to a designated Union officer, who in turn brings it to the attention of the Plant Supervisor within seven days of the occurrence. (*Id.*) Second, if the grievance is not amicably resolved, it is reduced to writing within seven days after its submission to the Plant Supervisor, including all of the facts regarding the alleged grievance and the signature of the employee. (*Id.*) If there is still no resolution of the grievance within seven days of the written submission, the grievance is then referred to arbitration. (*Id.*)

Between January 10, 2006, and March 17, 2006, Edmonds was tardy twenty-one times. (*Id.* ¶9.) Specifically, Edmonds was tardy on January 10, 11, 27, 30, 31; February 2, 3, 7, 8, 9, 13, 14, 15, 21, 23, 24, 27, 28; and March 1, 2, and 17. (*Id.*) He was assessed one-half of a control point for each of these incidents. (*Id.*) During this time, Edmonds met with his supervisor, Mike McDonald, regarding his tardiness. (*Id.* ¶10.) McDonald also discussed Edmonds' tardiness with the Union's president, Andre Joseph. (*Id.*) On February 24, 2006, McDonald issued Edmonds a written warning. (*Id.* ¶11.) Then on February 27 McDonald placed Edmonds on a five-day suspension. (*Id.*) The Union was present when these disciplinary measures were taken. (*Id.* ¶11.) In fact, Feralloy initially wanted to discharge Edmonds rather than suspend him, but the Union intervened and convinced Feralloy to reduce the discipline to a suspension. (DE 31-1 § III, ¶3.)

When Edmonds was placed on his five-day suspension, he was told that after he resumed work, he must arrive at work fifteen minutes before beginning his shift. (DE 29-1 ¶13.)[2] But Edmonds was not paid for the additional fifteen minutes. (DE 29 ¶14.) However, Edmonds was paid for a half-hour, duty-free lunch, during which he was allowed to leave the premises. (*Id*.) According to Edmonds, after his suspension was over he arrived fifteen minutes before his shifts on March 13, 14, 15, and 16. (*Id*. ¶13.) But he did not arrive fifteen minutes early for his March 17 shift, and as a result he was terminated. (*Id*.)

Edmonds did not file a grievance over any of the discipline he received related to his tardiness. (*Id*. ¶15.) Specifically, he never grieved this February 24 written warning; the February 27 five-day suspension; or his even ultimate termination. (*Id*.) Indeed, Edmonds never grieved even a single control point assessed to him because of tardiness. (*Id*.) Yet at the meeting when Edmonds was informed he was being terminated, Union Steward Dave Meade told Edmonds that he would get the grievance process started. (*Id*. ¶16.) However, a few days later Meade told Edmonds that the Union was not going to file a grievance and that Edmonds needed to retain his own counsel if he wanted to pursue the matter. (*Id*.)

Before I get to the lawsuit, there's one more part to this story. In October 2005, there was a picket line at Feralloy. (DE 1 ¶13.) Edmonds and other employees were assessed one and a half control points for refusing to cross the picket line. (*Id*. ¶¶13-14.) The Union grieved these control points for all of its members. In June 2006, the Union and Feralloy settled the grievance, and as part of that settlement, Feralloy agreed to not assess any control points for the incident.

---

[2] Incidentally, the CBA states that Edmonds should have been at work fifteen minutes before his shift anyway. (*See* DE 31-2 § 14.4.)

(DE 31-1 § II, ¶5.) Regardless, none of the control points Edmonds received for the picket line incident were used as a basis for the disciplinary actions taken against him in 2006 because the grievance automatically suspended their application. (*See id*. § III, ¶2; DE 29 ¶12.)

The same day that the Union settled its grievance with Feralloy, Meade called Edmonds to inform him of the settlement and suggest that he might be able to get his job back. (DE 31-1 § III, ¶9.) Meade told Edmonds that he should call McDonald. (*Id*.) Edmonds did, but McDonald told him Feralloy wasn't interested in bringing him back. (*Id*. ¶11.) Edmonds then called Meade to relay his conversation with McDonald, and Meade told Edmonds that the Union wasn't going to do anything for Edmonds because his discharge was due to his tardiness, not the picket line incident. (*Id*. ¶12.)

After receiving his right-to-sue letter from the EEOC, Edmonds filed this suit against both the Union and Feralloy. (DE 1 at 9.) Edmonds' primary contentions are that Feralloy discriminated against him because of his race, refused to properly compensate him for overtime work, and breached the CBA; and that the Union breached its duty to represent him by failing to pursue his claims. (DE 1 at 1.) Edmonds' Complaint contains six counts. The first two claim that Feralloy's alleged discrimination violated Title VII of the Civil Rights Act of 1964, (*id*. ¶¶24-28) and 42 U.S.C. § 1981, (*id*. ¶¶29-32). The third asserts that Feralloy's refusal to pay him overtime violated the Fair Labor Standards Act, (*id*. ¶¶33-34), and the fifth that it violated the Indiana Wage Payment Statute, I.C. §§ 22-2-5-1 & 22-2-5-2, (*id*. ¶¶37-39). Count IV alleges Feralloy breached the CBA. (*Id*. ¶¶35-36.) Finally, the sixth count claims the Union breached its duty of fair representation. (*Id*. ¶¶40-41.)

Prior to answering the complaint, the Union filed a motion to dismiss in September 2007. (DE 7.) Gregg declined to respond to that motion, but I only granted it in part. (DE 11.) So count VI is the only one remaining against the Union.

Both Feralloy and then Union then filed their motions for summary judgment on March 19, 2009. (*See* DE 27 & 30.) Again, Gregg declined to respond. And after Gregg's time for responding passed, the defendants both filed motions for a summary ruling on April 30. (*See* DE 32 & 33.) Yet again, Gregg declined to respond.

I will not grant the motions for a summary ruling [DE 32 & 33]. I will instead proceed to a review of the issues raised in the defendants' motions for summary judgment.

## DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In making this determination, I must construe "all facts and reasonable inferences from the record in the light most favorable to [Edmonds]." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005). *See also Haefling v. United Parcel Serv.*, *Inc.,* 169 F.3d 494, 497 (7th Cir. 1999). But Edmonds is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quotation marks and brackets omitted). Furthermore, Edmonds is supposed to set forth specific facts showing there is a genuine issue of material fact and that the defendants are not entitled to

judgment as a matter of law. *Anderson*, 477 U.S. at 252. And he must do so "with reasonable particularity," *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 285 (7th Cir. 1997) (quotation marks omitted), because it is not my job to "scour [the] record to locate evidence supporting a party's legal argument," *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). *See also Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them. . . . It is the parties' responsibility to allege facts and indicate their relevance under the correct legal standard. . . .") (quotation marks omitted). His failure to do so forces me to accept the facts presented by the defendants, so long as they are supported by evidence, but Edmonds still gets the benefit of reasonable inferences from those facts.

Given this standard, it is clear to me that this case presents no genuine issues of material fact. Therefore, summary judgment is appropriate for the defendants.

**I.      TITLE VII AND § 1981**

The substantive examination of intentional race discrimination is the same under both Title VII and § 1981. *Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 338 (7th Cir. 2002). A plaintiff can establish a race discrimination claim through either the direct or indirect methods. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938 (7th Cir. 2003). Because there is no direct evidence of discrimination, I analyze Edmonds' claim under the familiar indirect method in which he must demonstrate that 1) he is a member of a protected class; 2) his job performance met Feralloy's expectations; 3) he experienced an adverse employment action; and 4) he was treated less favorably than similarly situated employees outside of his protected class. *See Burks v. Wis. Dep't of Transp.,* 464 F.3d 744, 750-51 (7th Cir. 2006). If he establishes a *prima facie*

7

case, the burden shifts to Feralloy to proffer a legitimate, nondiscriminatory reason for its action. *Id*. at 751. If Feralloy does so, the burden shifts back to Edmonds to produce evidence showing Feralloy's proffered reason is a pretext for discrimination. *Id*.

While there is evidence that Edmonds is a member of a protected class and experienced adverse employment actions, he has failed to establish the other elements of a *prima facie* case. First, there is no evidence that Edmonds' job performance was satisfactory. He was tardy for work twenty-one times between January 10 and March 17, 2006. Even if he had no days off during that period, that's still nearly a third of the time. And Feralloy made clear that it did not accept Edmonds' behavior. It gave him verbal and written warnings and a five-day suspension before it terminated him. Thus, it is clear Edmonds has not established the second element of his *prima facie* case.

In addition, there is no evidence in this record that Edmonds was treated differently than similarly situated individuals outside of his protected class. Perhaps that shouldn't be surprising given that his complaint does not even really allege that he was the victim of race discrimination. (*See* DE 1 ¶¶25 ("Edmonds was the only black employee whose control points were not removed after arbitration.") & 26 ("Edmonds was the only black employee who was terminated as a result of the disparate practices of Feralloy.").) These allegations instead essentially allege that he experienced an adverse employment action and is in a protected class, but does not suggest a causal relationship between the two. Regardless, the record before me contains no evidence to support a finding in favor of Edmonds on this element.

Finally, even if Edmonds could establish a *prima facie* case, Feralloy has established a legitimate, non-discriminatory reason for terminating him. Edmonds' continued tardiness

8

between January and March 2006 lead to the assessment of a sufficient number of control points to justify his termination under the CBA. (*See* DE 31-2 at 49-50.) Moreover, Feralloy also went through progressive disciplinary actions, so Edmonds should have been on notice to change his behavior. Because there is no evidence that Feralloy used Edmonds' tardiness as a pretext for firing him, Edmonds' discrimination claims would also fail in this regard.

**II.    FAIR LABOR STANDARDS ACT**

The Fair Labor Standards Act generally sets minimum-wage, maximum-hour requirements. *See* 29 U.S.C. § 201 *et seq*. *See also Jonites v. Exelon Corp.*, 522 F.3d 721, 722 (7th Cir. 2008). Edmonds' complaint alleges that Feralloy violated the FLSA by requiring him to report for work fifteen minutes early for his shifts on March 13-16 without paying him for that time. (DE 1 ¶34.) While it is unclear to me that this one hour of on-the-clock time should actually be compensable, *see Brown v. Family Dollar Stores of Ind., LP* 534 F.3d 593, 594 (7th Cir. 2008) (noting that a plaintiff "bears the burden of proving that she performed overtime work for which she was not properly compensated"), it seems to me that there is an argument that it is, *see* 29 C.F.R. § 785.16 (noting that an employee must be allowed to leave the job during the waiting time in order for that time to be considered "off duty"). But Edmonds was fully compensated for his worktime anyway. He was given a half-hour of pay for his lunch time during each of those days even though he was not on duty. That half-hour of pay is not mandated by the FLSA because it is not compensable worktime, and the fact the Feralloy gave it to its employees anyway does not transform it into compensable worktime. *See* 29 C.F.R. § 785.19 ("Bona fide meal periods are not worktime."). *See also Leahy v. City of Chi.*, 96 F.3d 228, 230 n.2 (7th Cir. 1996) (noting that a meal period is not compensable if the "predominant

benefit" of the period is for the employee rather than the employer); *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 711 (7th Cir. 1996) (simply because the time is paid by the employer does not transform it into compensable worktime under the FLSA). Consequently, Edmonds was fully paid for his compensable work even when he arrived fifteen minutes early because (assuming that time was actually compensable) his compensable worktime did not exceed the maximum under the FLSA. Edmonds' FLSA claim therefore fails.

### III. BREACH OF CONTRACT AND THE DUTY OF FAIR REPRESENTATION

In count IV, Edmonds alleges that Feralloy breached the CBA, and in count VI he alleges that the Union breached its duty of fair representation. These two are what is called a "hybrid" claim under § 301 of the Labor Management Relations Act. *See Del Costello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165-72 (1983). And they can't survive summary judgment here.

#### A. CBA Claim Against Feralloy

Edmonds' claim that Feralloy breached the CBA can't be a claim under state law. *See Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 809 (7th Cir. 2009) (noting that state-law claims requiring interpretation of a collective bargaining agreement are pre-empted by the LMRA). So it must be for relief under § 301 of the LMRA, 29 U.S.C. § 185.

But Edmonds can't get out of the starting gate under § 301. Ordinarily "an individual employee may bring suit against an employer for breach of a collective bargaining agreement . . . [but] is required to attempt to exhaust any grievance or arbitration remedies provided" in that agreement. *Del Costello*, 462 U.S. at 163. *See also Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 501 (7th Cir. 1996). Edmonds didn't grieve any of the disciplinary actions against him. He declined to grieve each of the individual control point assessments. Nor did he grieve

the written warning on February 24 or the five-day suspension on February 27. Indeed, Edmonds did not even grieve his ultimate termination. In short, Edmonds did not exhaust, or even attempt to exhaust, his remedies under the CBA. So the only way he can state a claim under § 301 is if he can show that the Union breached its duty to fairly represent him. *See Del Costello*, 462 U.S. at 164. It didn't.

**B.      Fair Representation Claim Against The Union**

Unions generally have an obligation to represent their members when the members believe their employer has violated a collective bargaining agreement. A union breaches that duty when it refuses to represent the member and that refusal is "arbitrary, discriminatory, or in bad faith." *See Vaca v. Sipes*, 386 U.S. 171, 190 (1967). But the member must bring his claim within six months of "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 914 (7th Cir. 1999) (quotation marks and brackets omitted).

Edmonds did not bring this suit until July 17, 2007. In order for the suit to be timely, he must have discovered the Union's alleged acts no earlier than January 17, 2007. That seems very unlikely. Edmonds was terminated in March 2006. At the meeting in which he was fired, the Union representative told him the Union would put together the grievance papers. Within a couple of days of that meeting, the Union informed him that it wasn't going to pursue the grievance and that he was on his own. If Edmonds' claim is based on this initial failure to represent him, then his claim is barred by the statute of limitations.

The Union then called Edmonds in June 2006 to inform him about the settlement of the picket line control point grievance. The Union told him to call Feralloy to see if he could get his

11

job back. He did, but Feralloy wasn't interested. Edmonds then talked to the Union again, and it informed him that it wasn't going to help him. Unfortunately, there is nothing in the record before me to establish when that second conversation with the Union occurred. So I can't say definitively that it fell outside the statute of limitations. And Edmonds gets the benefit of the doubt on summary judgment. But Edmonds only gets the benefit of "*reasonable* inferences" from the evidence, *see Moser*, 406 F.3d at 900 (emphasis added), and it isn't reasonable to infer that the second conversation happened some six months after the Union first contact Edmonds about the picket line settlement. So I find that the statute of limitations bars this claim.[3]

Fortunately, I don't need to rely on that being an unreasonable inference because Edmonds' claim has no merit anyway. There is no evidence to suggest that the Union acted in an arbitrary or discriminatory way, or that it acted with bad faith. Edmonds was fired because of his excessive tardiness from January to March 2006. There's not much the Union can do when its member is late for work roughly one out of every three days and is getting disciplined for it but refuses to change his behavior. Still the Union came to Edmonds' aid when Feralloy wanted to fire him in February. It convinced Feralloy to just suspend Edmonds rather than fire him. Moreover, the Union also went out of its way to call Edmonds to inform him of the picket line grievance settlement. Because Edmonds was fired for accumulating other control points - not the points resulting from the picket line incident - the settlement had essentially no effect on him. Yet the Union called anyway. Given these two actions, it's tough to swallow the argument that

---

[3] This is essentially the same argument the Union raised in its motion to dismiss. (*See* DE 8 at 3.) I rejected the argument on the motion to dismiss because there the benefit of the doubt went to Edmonds. (*See* DE 11 at 7-8.) The standards aren't as forgiving on summary judgment.

the Union was acting arbitrarily or discriminating against Edmonds, or that it was acting in bad faith. And aside from the fact that it would not file a grievance on his behalf, there is absolutely no evidence in the record before me that the Union acted improperly with respect to Edmonds. I am left to conclude that the Union refused to grieve Edmonds' discipline because it thought the discipline was warranted.

Therefore, Edmonds' claim against the Union for breach of the duty of fair representation fails. Consequently, his claim against Feralloy also fails because he did not exhaust his remedies under the CBA.

## IV. INDIANA WAGE PAYMENT STATUTE

Edmonds' case is now whittled down to his claim under the Indiana Wage Payment Statute, Ind. Code §§ 22-2-5-1 & 22-2-5-2. That statute sets minimum wage and overtime compensation requirements for employers in the State of Indiana. But the statute does not apply to employers who are "subject to the minimum wage provisions of the federal Fair Labor Standards Act of 1938." Ind. Code § 22-2-2-3. *See also Parker v. Schilli Transp.*, 686 N.E.2d 845, 850-51 (Ind. Ct. App. 1997). Feralloy says it is covered by the FLSA, (DE 28 at 11), and it appears to be, *see* 29 U.S.C. §§ 203(d) & 206. Furthermore, under Indiana law, overtime claims cannot be raised under the Wage Payment Statute; the exclusive remedy is the FLSA. *See Parker*, 686 N.E.2d at 851 ("[I]n Indiana, claims for overtime compensation cannot be raised under the Wage Law. . . ."). *See also Abner v. Dep't of Health of State of Ind., ex rel. Ind. Soldiers' & Sailors' Children's Home*, 777 N.E.2d 778, 784 n.4 (Ind. Ct. App. 2002). So Edmonds' claim under the Indiana Wage Payment Statute fails as well.

**CONCLUSION**

For the foregoing reasons, Defendants' motions for summary ruling [DE 32 & 33] are **DENIED** and Defendants' motions for summary judgment [DE 27 & 30] are **GRANTED**. There are no remaining issues to be resolved in this matter. Therefore, the Clerk of the Court is **DIRECTED** to **TERMINATE** this case.

    **SO ORDERED**.

    DATED: June 3, 2009

                            s/ Philip P. Simon
                            PHILIP P. SIMON, JUDGE
                            UNITED STATES DISTRICT COURT